# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 17, 2015    Decided November 24, 2015

No. 11-3034

UNITED STATES OF AMERICA,
APPELLEE

v.

WILLIAM CORDOVA, ALSO KNOWN AS MARIO, ALSO KNOWN AS
CENTINELLA,
APPELLANT

---

Consolidated with 11-3043, 11-3044

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-cr-00167-1)
(No. 1:08-cr-00167-2)
(No. 1:08-cr-00167-4)

---

*Robert S. Becker*, *Anthony D. Martin*, and *Mary E. Davis*, all appointed by the court, argued the causes and filed the joint briefs for Appellants. *Sherlock V. Grigsby* entered an appearance.

*Lauren R. Bates*, Assistant U.S. Attorney, argued the cause for Appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and

*Elizabeth Trosman*, *Elizabeth H. Danello*, *Gilberto Guerrero, Jr.*, and *Nihar Ranjan Mohanty*, Assistant U.S. Attorneys.

Before: TATEL, MILLETT, and WILKINS, *Circuit Judges*.

PER CURIAM: William Cordova, Jose Gutierrez, and Melvin Sorto appeal their convictions for conspiracy, violent crimes in aid of racketeering, murder, assault, and federal and District of Columbia weapons offenses. They raise eight claims, four of which we address here; the others we address in a judgment issued contemporaneously with this opinion. Finding none of the challenges examined herein meritorious, we affirm as to these issues.

## I.

Cordova, Gutierrez, and Sorto (collectively "Appellants") belong to Mara Salvatrucha, an international criminal gang also known as MS-13. All three men are originally from El Salvador. When Cordova and Gutierrez arrived in the District of Columbia, they moved in with Misael Esquina-Flores and his parents, Feliciana Esquina-Flores and Tomas Esquina, whom they had known in El Salvador. Local MS-13 members treated Cordova and Gutierrez deferentially because they came from El Salvador. Believing that the local gang presence was weak, Cordova and Gutierrez actively encouraged members to commit more violent crimes to improve MS-13's status in the local gang hierarchy.

On the evening of July 30, 2006, Cordova and Gutierrez pulled up next to another car, announced to the three men inside that they were MS-13 members, ordered the men not to move, and then opened fire, injuring those inside. None of the victims died.

On April 22, 2007, Cordova and Gutierrez struck again, this time joined by Sorto. In retaliation for an attack on MS-13 by members of a rival gang, the three men trailed the rival gang members back to their home turf. They then opened fire on the group, killing Edwin Ventura and severely wounding Nelson Maldonado.

Later in 2007, Cordova and Gutierrez shot Feliciana Esquina-Flores while she was waiting for a bus. Although Feliciana survived the shooting, she is now blind.

Based on these three armed assaults, the government charged Appellants with conspiracy, violent crimes in aid of racketeering, murder, assault, and federal and District of Columbia weapons offenses. A jury convicted Appellants on all counts.

## II.

Cordova, Gutierrez, and Sorto argue that court-imposed restrictions limiting their personal access to certain discovery documents deprived them of their Sixth Amendment rights to effective representation and to assist in their defense. Because they suffered no plausible prejudice, we reject the argument.

## A.

At a pretrial conference, the District Court ordered the government to disclose to Appellants every Thursday any prior statements of witnesses who would be called to testify the following week. Those prior statements are commonly referred to as "Jencks Act materials," 18 U.S.C. § 3500. The District Court's order was more favorable to Appellants in that regard than the Jencks Act's requirement of disclosure

*after* a government witness testifies on direct examination, *id.* § 3500(b); *see also* FED. R. CRIM. P. 26.2.

The District Court subsequently issued a protective order directing that Appellants could only review the Jencks Act materials in the physical presence of counsel or, as later clarified, defense paralegals or investigators. The order forbade Appellants' possession of the materials or copies of them. For some unknown reason, the record contains nothing at all about the entry of this protective order. There is no protective order in the record, no notice of its entry on the docket, no trace of an in-court, on-the-record discussion concerning the order's entry, and no written or transcribed explanation of the bases for the judge's decision to adopt the order. All that the record and briefing indicate is that there was such a protective order and that all parties were aware of its terms. None of the parties had any explanation for why the protective order and all material surrounding its entry are missing from the record.

Midway through the second week of trial, counsel for Gutierrez asked the court to reconsider the protective order. Gutierrez, whose English was limited, sought to "have the Jencks [materials] so that he could study it so that [meetings with counsel] would go a lot quicker." Trial Tr. 3 (Nov. 3, 2010, Afternoon Session). His attorney explained that, "instead of [counsel] translating the documents, [Gutierrez] would have had a chance to review them and think about them, and make our meeting[s] shorter and also more productive." *Id.*

The government opposed the request, citing concerns about security and the safety of witnesses involved in this prosecution of alleged MS-13 gang members. The government insisted that, "for those men to have that [Jencks]

information back at the D.C. jail, floating around, free rein, from inmate to inmate, is a disaster." *Id.* at 62.

Gutierrez responded that the protective order could not rest upon alleged concerns about the identity of witnesses because that information was already known to Appellants and could easily be shared with others regardless of any restrictions on their access to the Jencks Act materials. The requested modification, Gutierrez's counsel emphasized, was only to "get a copy when he leaves here in the evening of the Jencks material" for upcoming witnesses "so that he could review those, and . . . we could discuss them." *Id.* at 62-63.

The District Court denied Gutierrez's request "for the reasons previously articulated" – reasons that, alas, are not preserved anywhere in the record. *Id.* at 63.

The next day, after learning that a defense investigator had previously and mistakenly left some Jencks Act materials with Sorto at the jail and that Sorto had carried the documents "back and forth" to trial, *id.* at 65, the District Court instructed the Marshals not to permit Appellants to take any papers to or from the court at any time. Counsel then expressed concern that this new restriction would prevent Appellants from being able to keep and review their own notes from the trial or, once back at the jail, to write down thoughts or questions to bring to counsel the following day. That led to an *in camera* meeting between the District Court, counsel, and the Marshals Service, during which the parties agreed that:

> At the end of each court date, the counsel for the defendants will collect all papers of whatever kind that may have been either brought to court or used between counsel and their client, and keep it in their possession – counsel's possession – overnight. With regard to returning to court the next day, the

> defendants will be permitted, if they wish, to make notations or jot down their thoughts on paper that they happen to have access to at the prison for the purposes of follow-up discussions with their counsel when they return to court whenever the next day the court is in session.

Trial Tr. 78-79 (Nov. 4, 2010, Afternoon Session). The District Court reiterated that Appellants would not be permitted to "leave the court with anything at the end of the day" and that "under no circumstances shall there be any additional copies of the discovery that are presented to the defense that are made for working purpose or for anyone else to see, nor under any circumstances are [defense paralegals, investigators, and associates] to provide a copy to the defendants to keep and take with them back to the jail." *Id.* at 79-80.

**B.**

Under the Sixth Amendment, criminal defendants have a constitutional right to "be confronted with the witnesses against [them], . . . and to have the assistance of counsel for [their] defense." U.S. CONST. amend. VI. Appellants assert that the protective order's restrictions on their access to Jencks Act materials violated their Sixth Amendment rights by hampering counsel's ability to mount, and Appellants' ability to participate in, an effective defense against the government's witnesses. More specifically, Appellants argue that requiring defense team members to superintend their review of discovery materials pressured the defense into either (1) devoting time to sitting with Appellants as they reviewed papers rather than dedicating that time to other trial preparations, or (2) cabining the time Appellants had to review the papers. Either way, Appellants argue, the order

deprived counsel of the full benefit of Appellants' individual input on the Jencks Act materials, which could have contributed important contextual information and impeachment evidence. Appellants also contend that, had they been afforded greater access to the Jencks Act materials, they would have been able to assist their attorneys in identifying potential credibility issues and new topics for investigation.

The Federal Rules of Criminal Procedure give district courts the discretion to enter protective orders (subject always to the Sixth Amendment's limitations). "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." FED. R. CRIM. P. 16(d). Moreover, a "trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." *Alderman v. United States*, 394 U.S. 165, 185 (1969). The burden of showing "good cause" is on the party seeking the order, and "among the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger of perjury or witness intimidation, [and] the protection of information vital to national security[.]" FED. R. CRIM. P. 16(d) Advisory Committee's Note to 1966 Amendment to Former Subdivision (e); *see also* 2 CHARLES ALAN WRIGHT & PETER J. HENNING, FEDERAL PRACTICE AND PROCEDURE § 262 (4th ed. 2009).

We ordinarily review a district court's balancing of those factors in issuing a protective order for an abuse of discretion. *See United States v. Mejia*, 448 F.3d 436, 456 (D.C. Cir. 2006); *cf. United States v. Celis*, 608 F.3d 818, 829-40 (D.C. Cir. 2010) (no Sixth Amendment violation where "[t]he protective order and its management by the district court

reflect an appropriate balancing of interests in the relevant case-specific context"). But here, the complete dearth of information in the record regarding the issuance of the protective order confounds that effort. There is no visible exercise of discretion or balancing of factors by the District Court for us to review. *Cf. United States v. Williams*, 951 F.2d 1287, 1290 (D.C. Cir. 1991) ("The purpose of an appeal is to review the judgment of the district court, a function we cannot properly perform when we are left to guess at what it is we are reviewing.").

Likewise, in reviewing Appellants' challenge to the protective order's limitations on their access to the Jencks Act materials, we ordinarily would apply harmless error review if Appellants had preserved an objection to the order below and plain error review if they had not. However, the complete absence of any record of the order's entry – and thus necessarily of any objections to it – upends that inquiry. It would seem less than fair to hold Appellants' feet to the fire for not documenting their prior objections to an undocumented order entered for undocumented reasons.

No matter. Even assuming that entry of the protective order was an abuse of discretion, there must be some material prejudice to Appellants to establish either harmless or plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993) (to establish plain error, defendants must show, *inter alia*, that the error affected their "substantial rights"); *United States v. Merlos*, 8 F.3d 48, 50 (D.C. Cir. 1993) ("[B]oth harmless error and plain error review require us to determine whether the error was prejudicial."); FED. R. CRIM. P. 52(a) & (b) (same for both harmless error and plain error). The government has demonstrated beyond a reasonable doubt that there was no such prejudice here.

To begin with, even though Appellants' individual use and access were subject to conditions, the effects of those limitations were counterbalanced by the District Court's decision to afford them four to eight days' advance receipt of the materials when the Sixth Amendment and Jencks Act only require disclosure after the witness has testified. *See* 18 U.S.C. § 3500; *Palermo v. United States*, 360 U.S. 343, 353 n.11 (1959) ("The statute as interpreted does not reach any constitutional barrier."); *see also Scales v. United States*, 367 U.S. 203, 257-58 (1961) ("That the procedure set forth in the [Jencks Act] statute does not violate the Constitution . . . was assumed by us in *Palermo*[.]"); *United States v. Stanfield*, 360 F.3d 1346, 1356-58 (D.C. Cir. 2004) (noting that "the time allotted for review of Jencks material is often relatively brief," and finding no abuse of discretion where district court gave defense counsel only nine minutes to review "a very thick stack of papers" after witness's direct testimony). The District Court, in other words, built in a window of time that ameliorated the practical impact of the access conditions.

Moreover, defense counsel had full and unfettered access to the Jencks materials at all relevant times, and the protective order did not otherwise limit their ability to discuss the materials with Appellants or to obtain their input.

The proof that the District Court's balance did not prejudice Appellants is in the pudding. The District Court invited Appellants to ask for extra time or a continuance if needed to review and investigate the Jencks Act materials. *See* Pretrial Conference Tr. 46-47 (October 14, 2010) (after counsel for Cordova represented that he would "be moving for a break in the trial" if a "real difficulty in investigating" arose, District Court said: "That's fine. And you will get it"); *id*. at 47 (District Court indicated that if the defense "need[s] time to explore it, we will suspend the trial"); *id*. at 48

(District Court assured defense counsel, "I am not going to let you be sandbagged"). The record does not indicate that any Appellant ever expressed a need for that additional time. Nor – as the government points out – in all the intervening time, have Appellants identified a single concrete instance in which their cross-examination or any other aspect of their defense would have changed if they had been given unconditional access to the Jencks Act materials. *Cf. United States v. Emor*, 573 F.3d 778, 785-86 (D.C. Cir. 2009) (any error in government's failure to produce potential Jencks Act material was harmless because defendant failed to show disclosure would have affected the trial's outcome); *Celis*, 608 F.3d at 839-40 (no error in trial court's refusal to grant defendant continuances to review Jencks Act materials where the court adjusted the trial schedule to afford the defense additional time, defendant did not identify what additional information she hoped to uncover or how it would have affected the result at trial, and counsel vigorously and effectively cross-examined the witness in question). The record thus forecloses any colorable claim of actual prejudice, and that is fatal to Appellants' Sixth Amendment claim.

## III.

Cordova, Gutierrez, and Sorto argue that the trial judge erred when he denied Gutierrez's motion to recuse himself in response to an allegedly threatening letter.

## A.

Prior to trial, in a search conducted pursuant to a separate investigation, the government found a letter Gutierrez had written to an acquaintance named Liliana. The letter asked Liliana to "help me with the Lady of Sivar to silence everyone who is against me." Opp. to Def.'s Recusal Mo. 3. The letter

then listed the judge, the prosecutors, potential witnesses, and Gutierrez's codefendants in this case.

Concerned that the letter could constitute a threat, the government informed the District Court about the letter's existence and its plan to investigate further. After reviewing the letter, the government's MS-13 expert in El Salvador opined that the letter's reference to the "Lady of Sivar" could be referring to "a shot caller or a program runner from San Salvador" who would have the authority to order the named individuals killed. *Id.* at 4. The government also located Liliana, who interpreted the letter to mean that Gutierrez wanted her to send the names to a "witch doctor in El Salvador who would use magic to determine if one of the names listed was 'snitching' on Gutierrez." *Id.* Unable to afford the witch doctor's fee, however, Liliana never followed up.

Gutierrez moved for the trial judge's recusal on the basis of the letter. The judge denied the motion, explaining that given Liliana's statement and the fact that Gutierrez had written the letter "well over a year ago," he had "no basis to think whatsoever that any of these defendants [were] . . . intending or trying in any way to be harmful to this Court or anyone else." Pretrial Conf. Tr. 50 (Oct. 14, 2010); *see also* Trial Tr. 17-18 (Oct. 18, 2010). Therefore, the judge did not "believe it would affect my conducting of this trial and ruling on evidence and ruling on Motions in any way." Pretrial Conf. Tr. 50 (Oct. 14, 2010). He also rejected any additional security for himself, his family, or the trial.

When the government later sought to introduce the letter as evidence of Gutierrez's consciousness of guilt, the judge refused to admit it on the ground that it was substantially more prejudicial than probative under Federal Rule of

Evidence 403's balancing test. He reasoned that the "total lack of clarity as to what exactly" Gutierrez's intent had been in writing the letter and the consequent "interpretation by experts" would only confuse the jury. Trial Tr. 17 (Nov. 17, 2010, Morning Session).

**B.**

The recusal statute, 28 U.S.C. § 455(a), requires that a judge "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." We review a district court's denial of a motion to recuse for abuse of discretion, "appl[ying] an 'objective' standard: Recusal is required when 'a reasonable and informed observer would question the judge's impartiality.'" *S.E.C. v. Loving Spirit Found. Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 114 (D.C. Cir. 2001) (en banc) (per curiam)). This standard requires that we take the perspective of a fully informed third-party observer who "understand[s] all the relevant facts" and has "examined the record and the law." *United States v. Holland*, 519 F.3d 909, 914 (9th Cir. 2008) (internal quotation marks omitted) (alteration in original).

This Circuit has never decided a recusal claim based on an alleged threat against the trial judge. But other circuits have, and they recognize that even a legitimate threat does not necessarily require recusal. *In re Basciano*, 542 F.3d 950, 956 (2d Cir. 2008) ("Although a plot or threat, real or feigned, may create a situation in which a judge must recuse himself, recusal is not ordinarily or routinely required. Even where a threat is serious . . . a judge may appropriately decline to recuse himself, at least in some circumstances." (internal citations omitted)); *United States v. Gamboa*, 439 F.3d 796, 817 (8th Cir. 2006), *abrogated on other grounds by United*

*States v. O'Brien*, 560 U.S. 218 (2010) ("While a defendant's threat against a judge may in some cases raise a sufficient question concerning bias on the part of that judge, recusal is not automatic on the mere basis of the judge's knowledge of the threat."); *United States v. Cooley*, 1 F.3d 985, 993-94 (10th Cir. 1993) (noting that "threats or other attempts to intimidate the judge" "will not ordinarily satisfy the requirements for disqualification under § 455(a)"). Rather, the trial judge "must evaluate the threat itself to determine how much risk there is that it may be carried out and how much harm there would be if it were" to determine if the threat would cause a reasonable observer to question the judge's impartiality. *Holland*, 519 F.3d at 914. "If it is a close case, the balance tips in favor of recusal." *Id.* at 912.

Our sister circuits have identified several helpful factors to determine whether the trial judge should have recused himself. The Ninth Circuit listed three in *United States v. Holland*: (1) "[t]he defendant's capacity to carry out the threat," including whether the defendant has taken "concrete steps" or has accomplices; (2) "[t]he defendant's demeanor and the context of the threat," including whether the defendant was "serious in carrying out the threat"; and (3) whether the "perceived purpose of the threat" was to "force recusal and manipulate the judicial system." *Id.* at 914-15. Under the third factor, receipt of a threat from an "extrajudicial source" decreases the risk that the defendant is attempting to manipulate the process and accordingly "has a higher potential for generating a situation where the judge's impartiality might reasonably be questioned." *United States v. Greenspan*, 26 F.3d 1001, 1006-07 (10th Cir. 1994) (citing *Liteky v. United States*, 510 U.S. 540 (1994)). The Second and Tenth Circuits have identified a fourth factor: whether the threat resulted in any conduct by the court other than matter-of-course judicial rulings that could be viewed as prejudicial

toward the defendant. *See id.* (reasoning that the district court's decision to accelerate sentencing and its refusal to grant a continuance of the sentencing hearing "could have contributed to an appearance that the trial court was prejudiced against Greenspan" after receiving a death threat, as such measures made it "obvious[] [that the judge] took the threat very seriously"); *Basciano*, 542 F.3d at 957 (finding no error in refusal to recuse in part because the court did nothing, other than ruling against the defendant, that would "reveal partiality"). Underlying several of these factors is an understanding that the judge's subjective response to an alleged threat is relevant to our determination of whether an independent observer would expect the threat to impact the court's rulings. *See Greenspan*, 26 F.3d at 1006-07.

Here, Appellants argue that the judge's refusal to recuse "violated the spirit, if not the requirements of [Section] 455(a)" because (1) he continued to enforce the protective order, which implied that he believed Appellants were dangerous, despite his conclusion that there was no active threat against him and (2) the government continued to argue that the letter was threatening when it sought to introduce the letter as evidence of Gutierrez's consciousness of guilt. Appellants' Br. 27-32. Applying the factors identified by our sister circuits, we reject these arguments.

It is true that Gutierrez had the "capacity to carry out" a threat, as he was a respected member of a violent international criminal organization with a broad geographic reach. *See Holland*, 519 F.3d at 914-15. And because the government discovered the letter during an unrelated investigation, it is highly unlikely that Gutierrez intended just to delay or disrupt the proceedings in this case or force the judge to recuse himself. *See Greenspan*, 26 F.3d at 1006-07. Contrary to Appellants' contention, however, the judge's rulings on the

protective order suggest no bias. The government introduced ample evidence regarding witness safety to support the order, including witnesses' testimony that MS-13 members would kill them for testifying, the seizure from one Appellant's cell of jail records containing witnesses' names and locations within the jail, and Cordova's recorded telephone call threatening witnesses. *See Basciano*, 542 F.3d at 957; *see also Liteky*, 510 U.S. at 556 (Judicial conduct "consist[ing] of judicial rulings, routine trial administration efforts, and ordinary admonishments . . . to counsel and to witnesses" that "neither (1) rel[y] upon knowledge acquired outside such proceedings nor (2) display[] deep-seated and unequivocal antagonism that would render fair judgment impossible" cannot form the basis for recusal.). This evidence stood in contrast to the stale letter – more than a year old – and nothing in the record indicates that Gutierrez or anyone else took affirmative steps toward carrying out any threat. *See Holland*, 519 F.3d at 916. Further, although the government argued that the letter was threatening, the U.S. Marshals and the judge credited Liliana's statement that the letter had no threatening purpose and the judge requested no additional security for himself, his family, or the trial. *See id.* (noting that "[t]he district court did not consider the threats or Holland's capacity to carry them out serious enough to refer the incident to the FBI, nor did he request additional security from the U.S. Marshal's service"); *cf. In re Nettles*, 394 F.3d 1001 (7th Cir. 2005) (holding that recusal was required where the defendant made an unquestionably legitimate threat to bomb the Seventh Circuit courthouse).

The circumstances show that a reasonable and informed observer would not perceive the letter to give rise to a "significant risk" that the trial judge would "resolve the case on a basis other than the merits." *Holland*, 519 F.3d at 914.

We therefore conclude that he did not abuse his discretion in declining to recuse himself.

## IV.

Cordova, Gutierrez, and Sorto contend that the District Court's decision to conduct a preliminary conference on jury instructions in chambers – outside of their presence – amounted to a violation of their constitutional right to be present throughout their trial, and of Federal Rule of Criminal Procedure 43. Appellants further argue that the District Court's failure to create a record deprived them of effective representation before this Court.

## A.

On the morning of November 29, 2010, the District Court held an *in camera*, off-the-record conference with counsel to discuss proposed jury instructions. When proceedings continued on the record later that afternoon, the District Court summarized what had occurred, noting that the judge and attorneys had met to review the latest draft of the jury instructions "and to determine which, if any of them, required oral argument because of differences of opinion between the government and the defense with regard to the content of the instructions as currently constructed." Trial Tr. 4 (Nov. 29, 2010)**.** The District Court reported that the "overwhelming majority of the instructions . . . were not controversial and didn't require follow-up discussion on the record and argument," though he did acknowledge the "fairly sizable" list of potential instructions that did warrant follow-up and advocacy on the record, "and that's why we're here right now." *Id.* No objection was made to the off-the-record nature of the proceeding at this time, and the District Court and parties proceeded to review the disputed instructions on the record.

Two years after the trial had concluded, appellate counsel requested a hearing to reconstruct the record of the November 29 *in camera* conference. During this hearing, the trial court, trial defense counsel, and the prosecution attempted to recount exactly what had occurred during the off-the-record conference, though the recollections were not much more informative than the District Court's summary immediately following the conference. The District Court did reflect upon the purpose for holding the instruction conference as it did, explaining that

> the Court wanted to get in an informal setting where we could have a quick exchange back and forth, try to determine where there would be objections and where there wouldn't. And where there would be objections, then we would obviously come in to court and they would be voiced on the record and argued on the record; both sides could present their arguments.

Status Conf. Tr. 29 (Feb. 6, 2013). Counsel for the government agreed with the District Court's recollection that "a lot of it was boilerplate" and without objection, *id.* at 30, but also noted that where there were substantive exchanges "we came back into the courtroom and we did it all over again so that there was no misunderstanding as to . . . what positions either side had with respect to the . . . jury instructions," *id.* at 32.

**B.**

Because no objection to the *in camera* discussion was made – either prior to the conference taking place, or once the proceedings resumed on the record – we examine this issue only for plain error. *See United States v. Purvis*, 706 F.3d

520, 522 (D.C. Cir. 2013).  An appellate court may exercise its discretion to notice a forfeited error if there is (1) error, (2) that is plain, and (3) that affects substantial rights, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *Id.*; *accord Johnson v. United States*, 520 U.S. 461, 466-67 (1997); *see also* FED. R. CRIM. P. 52(b).  Appellants have not shown plain error here.

A defendant's constitutional right to be present during trial proceedings, while largely rooted in the Sixth Amendment's Confrontation Clause, is protected by the Due Process Clause of the Fifth Amendment in situations where the defendant is not actually confronting a witness or evidence against him.  *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam).  A defendant has a due process right to be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."  *Snyder v. Massachusetts,* 291 U.S. 97, 105-06 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964); *accord Gagnon*, 470 U.S. at 526.  Indeed, this Court has recognized that "due process clearly guarantees that the defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence.'"  *United States v. Gordon*, 829 F.2d 119, 123 (D.C. Cir. 1987) (quoting *Snyder*, 291 U.S. at 108); *see also Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."); *Gagnon*, 470 U.S. at 526; *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975) ("[A]n accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.").  But, as the Supreme Court noted in *Snyder*, the right to be present is guaranteed only to the extent that a fair and just hearing would be thwarted by a

defendant's absence, "*and to that extent only*." *Snyder*, 291 U.S. at 108 (emphasis added). There is no guaranteed right to presence "'when presence would be useless, or the benefit but a shadow.'" *Gordon*, 829 F.2d at 123 (quoting *Snyder*, 291 U.S. at 106-07).

The right to presence has been codified in Federal Rule of Criminal Procedure 43. *Gordon*, 829 F.2d at 123; *see also United States v. Harris*, 491 F.3d 440, 452 n.5 (D.C. Cir. 2007). As relevant here, Rule 43 gives a defendant a right to be present at "every trial stage, including jury impanelment and the return of the verdict." FED. R. CRIM. P. 43(a)(2). Certain exceptions, however, are identified by the Rule. Notably, the Rule carves out an exception to the presence requirement when "[t]he proceeding involves only a conference or hearing on a question of law." FED. R. CRIM. P. 43(b)(3). In such a case, the defendant need not be present. *Id.*

The application of the above authority to the instant case reveals several reasons why the District Court did not plainly err by holding its preliminary jury instruction conference outside the presence of Appellants.

First, there was no plain error under the Due Process Clause. Appellants have failed to show that a fair and just hearing was thwarted by their absence from the preliminary jury instruction conference. *See Gordon*, 829 F.2d at 123. Appellants have not pointed to any objection they would have raised had they been present for the in-chambers conference. Appellants have not demonstrated that their presence would have added anything to the discussion, nor have they shown that their presence would have had a reasonably substantial relation to their opportunity to defend against the charges against them.

Second, the preliminary jury instruction conference in this case falls within the "conference or hearing on a question of law" exception laid out in Rule 43(b)(3). *See United States v. Perez*, 612 F.3d 879, 883 (7th Cir. 2010) ("The content of jury instructions is a question of law, and as such the jury instruction conference, assuming *arguendo* it was a stage of trial, fell within the . . . exception for a conference or hearing on a question of law." (internal quotation marks omitted)); *United States v. Rivera*, 22 F.3d 430, 438-39 (2d Cir. 1994) ("The content of the instructions to be given to the jury is purely a legal matter, and a conference to discuss those instructions is thus a conference on a question of law at which a defendant need not be present." (internal citation omitted)); *United States v. Sherman*, 821 F.2d 1337, 1339 (9th Cir. 1987) ("We hold that a hearing outside the presence of the jury concerning the selection of jury instructions is a 'conference or argument upon a question of law' . . . ."); *United States v. Graves*, 669 F.2d 964, 972 (5th Cir. 1982) ("A defendant does not have a federal constitutional or statutory right to attend a conference between the trial court and counsel concerned with the purely legal matter of determining what jury instructions the trial court will issue."); *see also United States v. Jones*, 674 F.3d 88, 94 (1st Cir. 2012) (counsel's meeting with judge to consider a response to a jury request for re-instruction fell within the Rule 43(b)(3) exception). As recounted by the District Court and counsel both immediately after the hearing and two years later during the hearing to reconstruct the record, it is clear that the preliminary discussion of jury instructions sought only to identify agreement or disagreement on the lengthy proposed instructions, and thus only dealt with detailed and technical legal questions.

Finally, Appellants have failed to show prejudice in support of their claim that the off-the-record proceeding

deprived them of effective representation. Ineffective assistance of counsel can result when the court "interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citing cases). But a violation of the right to effective representation requires a defendant to establish prejudice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 146-47 (2006). In order to prove prejudice, the defendant must show that there is a "reasonable probability" – "a probability sufficient to undermine confidence in the outcome" – "that the result of the proceeding would have been different" absent the alleged error. *Strickland*, 466 U.S. at 694. While Appellants attack the reasoning behind the District Court's decision to hold the preliminary jury instruction conference off the record, they have not demonstrated any probability that the result of the proceeding would have been any different had the conference been held on the record. The absence of prejudice is particularly apparent here, where the in-chambers conference did not involve substantive discussion about the content of instructions, but rather involved only identifying the specific instructions that were not agreed upon by the parties so that substantive discussion as to those instructions could occur in the courtroom (and in Appellants' presence).

We nonetheless add a word of caution about conducting a jury instruction conference of this kind off the record. As Appellants have argued, off-the-record proceedings have the potential of impeding the ability of the appellate court to do its job. This case would have been much more complicated if the attorneys and the District Court had articulated conflicting recollections of what occurred off the record, or if Appellants had claimed that the off-the-record discussion strayed from simply "we object" to substantive discussion of grounds of an objection that was not later captured on the record, or if

Appellants had claimed that an objection was overruled in chambers but the ruling was not repeated in precisely the same manner during the subsequent on-the-record proceeding. In such a case, we would be presented with the awkward task of resolving a factual dispute about what happened below, a difficult exercise for this Court. "There can never be effective appellate review if the reviewing court is not able to obtain a clear picture of the precise nature of the alleged errors in the court below." *Lee v. Habib*, 424 F.2d 891, 897 (D.C. Cir. 1970). As the Seventh Circuit has recognized in a case similar to this one, "[i]t is possible that this procedure could injure the defense if it obscured the nature of the objections made and reasons for giving the instructions." *United States v. Murphy*, 768 F.2d 1518, 1536 (7th Cir. 1985). Fortunately, there was no violation of due process or Rule 43 in this case because Appellants have identified no prejudice from a conference that involved only discussions of *undisputed* questions of law and for which there was no dispute about what transpired off-the-record, but the risk that such a dispute could arise in the future does give us pause.

## V.

Cordova, Gutierrez, and Sorto assert that they are entitled to a new trial because they were denied their right to two attorneys under 18 U.S.C. § 3005, even after the government filed notice that it did not intend to seek the death penalty. We find that the District Court's dismissal of Appellants' second appointed attorneys was neither contrary to the statute nor an abuse of discretion.

## A.

Appellants were indicted on June 10, 2008 for, *inter alia*, murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), which can be punishable by death, *id.* Within

approximately two months after indictment, each Appellant was appointed two attorneys.

The government filed notice on February 16, 2010, that it did not intend to seek the death penalty as to each Appellant. At a hearing on March 18, 2010, the District Court announced that, following the government's notice, it had consulted with the Federal Public Defender, who had indicated to the court that "since it is not going to be a death penalty case, the public is not required to pay for two lawyers for each defendant." Status Conf. Tr. 8 (March 18, 2010). As such, the District Court determined that Appellants, while welcome to have a second lawyer at their own expense, would only be appointed one lawyer "at taxpayer expense." *Id.* Defense counsel argued in response that they believed that the status had not changed because the government was still seeking life sentences, the case was complex, and the second appointed lawyer was particularly useful in this case because they had one Spanish-speaking lawyer and one non-Spanish-speaking lawyer for each Appellant (all of whom are native Spanish-speakers). The District Court assured defense counsel that translation assistance would be made available as needed, and that, with respect to the second attorney, it was possible – but not very likely – that he would change his mind.

On May 12, 2010, Sorto sought reconsideration of the District Court's decision in the form of a motion to appoint a second defense attorney pursuant to 18 U.S.C. § 3005. The District Court denied the request on June 24, 2010.

**B.**

We review questions of statutory interpretation *de novo*. *United States v. Wishnefsky*, 7 F.3d 254, 256 (D.C. Cir. 1993). The proper meaning of 18 U.S.C. § 3005 is a matter of first impression in this Circuit. To the extent that Appellants argue

that, even if not obligated by statute, the District Court should have exercised discretion to appoint a second attorney, we review that decision for abuse of discretion. *See generally United States v. Donato*, 99 F.3d 426, 429 (D.C. Cir. 1996).

"As always, we begin with the text of the statute." *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *United States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002)). "Where the language is clear, that is the end of judicial inquiry 'in all but the most extraordinary circumstances.'" *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 474 (1992)); *see also Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms.").

With these principles in mind, we turn to the statutory text at issue here:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the

district, of the Administrative Office of the United States Courts. The defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution.

18 U.S.C. § 3005.

While a plain reading of the statute supports Appellants' position that the trigger to initiate and guarantee the right to a second lawyer is the return of an *indictment* of a "capital crime," *see United States v. Boone*, 245 F.3d 352, 359-60 (4th Cir. 2001), such a reading does not answer the question in this case – that is, whether the statute requires the retention of the second lawyer after the government has conclusively determined that it will not seek the death penalty. In this regard, the statute is silent and therefore ambiguous. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning *with regard to the particular dispute in the case*." (emphasis added)); *see also United States v. Wilson*, 290 F.3d 347, 353 (D.C. Cir. 2002) ("In determining the 'plainness or ambiguity of statutory language' we refer to 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" (quoting *Robinson*, 519 U.S. at 341)).

To address this ambiguity, we look to the statutory purpose. *Braxtonbrown-Smith*, 278 F.3d at 1352 ("Where the language is subject to more than one interpretation and the meaning of Congress is not apparent from the language itself, the court may be forced to look to the general purpose of

Congress in enacting the statute and to its legislative history for helpful clues."). We "must avoid an interpretation that undermines congressional purpose considered as a whole when alternative interpretations consistent with the legislative purpose are available." *Id.* (citing *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940)). "[E]ven when the plain meaning [does] not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole'" we must "follow[] that purpose, rather than the literal words." *Am. Trucking Ass'ns*, 310 U.S. at 543 (quoting *Ozawa v. United States*, 260 U.S. 178, 194 (1922)).

The language used by Congress suggests that the purpose of the statute would be best met by applying the mandate for two attorneys only as long as the death penalty is actually being pursued. The statute demands that at least one of the two appointed counsel "shall be learned in the law applicable to *capital cases*." 18 U.S.C. § 3005 (emphasis added). The reference to "capital cases" is significant, because even though Congress did not define the term in this section, Congress has repeatedly used "capital case" to mean a proceeding in which the death penalty has been imposed or a case in which the death penalty is being or could be sought. *See, e.g.*, 18 U.S.C. § 3510(b) (right of victim to attend trial even if she may appear as witness at subsequent sentencing phase in a death penalty case); 28 U.S.C. § 2266 (special habeas corpus procedures for cases where a death sentence was imposed); 42 U.S.C. § 14163 (grants to states to improve representation in cases where a death sentence may be sought or has been imposed). The Supreme Court and lower federal courts have historically used the term "capital case" in the same manner. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *United States v. Parker*, 103 F.2d 857, 861-62 (3rd Cir. 1939). Congress and the courts have imposed procedural

safeguards in cases where the death penalty is at issue that are distinct from the procedures required in noncapital cases, *see, e.g.*, *O'Dell v. Netherland*, 521 U.S. 151, 167 (1997); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993), because "there is a significant constitutional difference between the death penalty and lesser punishments," *Beck v. Alabama*, 447 U.S. 625, 637 (1980).

Thus, by requiring that at least one attorney be "learned in the law applicable to capital cases," Congress indicated that the purpose of the second lawyer is to provide additional support and expertise to defendants facing the possibility of the death penalty, precisely because defending those cases requires a separate and unique base of knowledge, training, and experience. Thus understood, the statute reflects Congress's policy decision that defendants relying on appointed counsel need even more help – and more specialized help – when their life hangs in the balance. If the death penalty is not on the table for a particular case, such expertise is no longer absolutely necessary for a fair proceeding to result. *Cf. United States v. Waggoner,* 339 F.3d 915, 918 (9th Cir. 2003) (reflecting that "the purpose of the two-attorney right is to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel" (internal quotation marks omitted)).

Further support for this conclusion is found in the amendment history of the statute. The provision now found at 18 U.S.C. § 3005 was originally enacted as Section 29 of the Crimes Act of April 30, 1790, 1 Stat. 118-19. The provision was included in the Revised Statutes at R.S. § 1034 (1878), and then placed in the United States Code at 18 U.S.C. § 563 (1925-26). In 1948, changes were made in phraseology, and the statute was moved from 18 U.S.C. § 563 to 18 U.S.C.

§ 3005, *see* 62 Stat. 814. Throughout this time, no truly substantive changes were made, and no discernable explanatory commentary was ever provided. *See Boone*, 245 F.3d at 365 (Kiser, J., concurring in part and dissenting in part) (noting "dearth" of legislative history); *In re Sterling-Suárez*, 306 F.3d 1170, 1173 & n.2 (1st Cir. 2002) (stating that the court can only speculate about changes to the provision "[a]bsent legislative history").

In 1994, Congress made the first substantive changes to the statute as part of the Violent Crime Control and Law Enforcement Act of 1994. *See* Pub. L. No. 103-322, § 60026, 108 Stat. 1796, 1982 (1994). It was at this time that Congress imposed the requirement in Section 3005 that at least one counsel "learned in the law applicable to capital cases" be provided to defendants indicted for capital crimes. The amendment also opted for the word "promptly" in place of the word "immediately" as to the timing of counsel's appointment, and further introduced the requirement that the court consider counsel recommendations of the Federal Public Defender organizations or the Administrative Office of the United States Courts. Concurrent with these changes, Congress also enacted the Federal Death Penalty Act of the Violent Crime Control and Law Enforcement Act of 1994. *See* Pub. L. No. 103-322, § 60002, 108 Stat. at 1959 (codified at 18 U.S.C. §§ 3591 to 3598). Among other things, the Federal Death Penalty Act requires that the government serve notice on a defendant charged with a death-penalty-eligible offense indicating whether the government believes that the death penalty is justified in that particular case. 18 U.S.C. § 3593(a). Such notice must be made "a reasonable time before the trial or before acceptance by the court of a plea of guilty." *Id.* The notice must: (1) state "that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . .

and that the government will seek the sentence of death; and (2) set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." *Id.* The Department of Justice has established comprehensive death penalty procedures based on the Federal Death Penalty Act. *See* U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL, § 9-10.020 (April 2014).

This notice requirement underscores the importance of the "prompt" appointment of the second attorney in death-penalty-eligible cases – that is, before the government makes its determination as to whether to seek a death sentence. Even among courts that disagree as to whether the second attorney is required after the government announces that it will not seek the death penalty, there is agreement that "prompt" means promptly after indictment, and not later. This is because the goal of the defense in this early stage of the proceedings is to convince the Attorney General not to seek the death penalty in the first place. *See, e.g.*, *In re Sterling Suárez*, 306 F.3d at 1173 (second attorney learned in the law of capital punishment "is likely to be especially useful in making and supporting arguments about mitigating and aggravating factors, primarily made at the stage when the Attorney General is determining whether or not to seek the death penalty and (still later) when the jury is determining the sentence"); *Boone*, 245 F.3d at 360 ("[T]he appointment of a second lawyer helps the defendant during this preliminary process when that investigation into relevant factors and presentment of information to the United States Attorney occurs. Surely, if the government decides not to seek the death penalty, then the penalty phase is won before trial, and a second lawyer has proven his worth."). While the death penalty is still on the table, there is a specific role for an attorney "learned in the law applicable to capital cases" to

play in the defense, but once the Attorney General has made a determination *not* to seek the death penalty, the requirement of counsel with such specialized expertise no longer serves that specific role.

Simply put, when we consider how federal capital prosecutions work in practice – practices that were established in 1994 contemporaneously with the amendment requiring at least one lawyer to be "learned in the law applicable to capital cases" – it is clear that the congressional purpose is best served by reading Section 3005 to *require* two attorneys only while the defendant faces the death penalty as a potential option.  Once the government has decided not to seek the death penalty, the trial court retains the discretion to keep or dismiss the second attorney, but it is not *per se* error for the court to choose dismissal.

This conclusion is in accord with the majority of our sister circuit courts that have considered the issue.  *See United States v. Douglas*, 525 F.3d 225, 237 (2d Cir. 2008) ("[O]nce the government has formally informed the court and the defendant of its intention not to seek the death penalty, the matter is no longer a capital case within the meaning of § 3005 and that section does not require the district court to continue the appointment of a second attorney."); *Waggoner*, 339 F.3d at 917-18 (term "capital crime" did not encompass the underlying offense when capital punishment could not be imposed and thus government's formal and irrevocable renunciation of intent to seek a conviction for capital murder justified denial of defendant's motion for continued representation by a second court-appointed lawyer); *United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) (any error in the failure of the district court to act on the defendants' requests to appoint death-penalty qualified counsel was harmless where the requests were rendered moot by the

government's decision not to seek the death penalty); *United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998) (defendant was not entitled to two court-appointed lawyers where the government had stated, on the record prior to trial, that it would not seek the death penalty; court determined that at that point the proceeding was transformed from a capital case into a noncapital case); *see also In re Sterling-Suárez*, 306 F.3d at 1175 ("[I]n this case there *are* practical reasons to treat the case as capital from indictment forward, for purposes of appointing learned counsel, *until it becomes clear that the death penalty is no longer an option*." (second emphasis added)).  Further support for our conclusion comes from those opinions interpreting Section 3005 in the wake of *Furman v. Georgia*, 408 U.S. 238 (1972).  *See United States v. Dufur*, 648 F.2d 512, 514-15 (9th Cir. 1980) (invalidation of death penalty provision in 18 U.S.C. § 1111 eliminated defendant's right to two attorneys in prosecution for "capital crimes"); *United States v. Shepherd*, 576 F.2d 719, 727-29 (7th Cir. 1978) (holding that because "there is no possibility that the death penalty can be imposed," this provision granting defendants a right to two counsel in capital cases was inapplicable); *United States v. Weddell*, 567 F.2d 767, 770-71 (8th Cir. 1977) (defendant accused of murder was not entitled to appointment of second attorney where *Furman* precluded imposition of death penalty and case thus lost its capital nature); *but see United States v. Watson*, 496 F.2d 1125, 1127-29 (4th Cir. 1973) (offense of first-degree murder still a "capital crime," and thus defendant charged with such offense had absolute statutory right to two attorneys on request, notwithstanding that under *Furman* the death penalty could not constitutionally be imposed).

The only circuit that has come to a different conclusion is the Fourth Circuit, *see Boone*, 245 F.3d at 359-60; *Watson*, 496 F.2d at 1129, but for the reasons stated above, we

respectfully disagree with its conclusion that Section 3005 unambiguously mandates that the second defense attorney must be retained after the prosecution irrevocably removes the possibility of a death sentence. For various reasons, such as the complexity of the issues or the amount of necessary investigation, it may be prudent for the District Court to allow the second lawyer to continue to assist with the representation, but the statute does not require it. Other than arguing that the District Court was required by statute to retain two attorneys for each Appellant through trial – a contention we reject – Appellants have not identified any basis to find an abuse of discretion by the District Court in dismissing the second appointed attorneys, and we find none.

## VI.

For the foregoing reasons, we affirm the judgment of the District Court with respect to the four claims addressed herein.

*So ordered.*