In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 21-1220

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID WALSH,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18:cr-450-1 — **Gary Feinerman**, *Judge.*

───────────────

ARGUED NOVEMBER 8, 2021 — DECIDED AUGUST 24, 2022

───────────────

Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

KIRSCH, *Circuit Judge.* At 71 years old, David Walsh robbed a bank with a firearm and nearly robbed another a few days later. During his sentencing hearing and just after the district court announced an intended 13 year sentence, Walsh lashed out with threats of violence against the judge, the judge's family, the probation officer, and the government's attorney. The judge denied Walsh's subsequent motion to recuse, finding

that Walsh's tirade was strategic and made for the purpose of getting a different sentencing judge. Over three months and several hearings later, the judge imposed a life sentence.

Walsh has appealed this sentence on two grounds. First, he contends that the life sentence is substantively unreasonable. And second, Walsh argues that his tirade required the judge's recusal. We disagree on both counts and thus affirm.

## I

Before the instant offenses, David Walsh's criminal history included convictions for the murder of a police officer, unlawful use of loaded weapons, two burglaries, and a previous armed robbery. He has been in and out of prison since 1965, with only short stints between release from confinement and new criminal conduct. In 1965, Walsh used a crowbar to break a window and commit burglary. Three years later, Walsh committed another burglary and murdered a police officer by shooting him five times in the chest. Walsh was paroled in May 1983 and arrested 37 days later under an alias for manufacturing and/or delivering marijuana. After receiving parole from that sentence in July 1984, Walsh was arrested 22 days later, using a second alias. This time, Walsh was convicted of unlawfully using a weapon after driving into several parked vehicles and exiting his car carrying a loaded .38 caliber revolver. Officers also found a loaded 12 gauge shotgun and a loaded Uzi submachine gun in Walsh's car. Walsh received parole from that sentence in April 1987 and was arrested 11 days later under a third alias for armed robbery.

On July 14, 2018, just nine months after receiving parole on the earlier armed robbery conviction, Walsh committed the armed bank robbery at issue in this case. He donned a

plastic mask, navy cap, dark clothes, and plastic gloves as he walked into a Chicago bank. After propping the door open with stoppers he brought with him, Walsh walked up to the tellers' counter and demanded cash. When the tellers hesitated, he held up a .357 caliber revolver and said, "I'm not playing." The tellers gave Walsh $3,700, and he exited the bank, retreated into a nearby alley, changed clothes, stashed his tools in a bag he had hidden between garbage cans, and left the area on public transportation without attracting attention.

Nine days later, Walsh recruited a getaway driver for another bank robbery. Unbeknownst to Walsh, however, the driver was an FBI informant. The next day, on July 24, 2018, the pair canvassed a different Chicago bank from a parking lot, and Walsh prepared his disguise; he put on the same outfit and plastic mask that he had used in the first robbery. FBI agents then arrested Walsh and recovered a loaded .357 caliber revolver, plastic gloves, and door stoppers.

For this conduct, Walsh pled guilty to three crimes: (1) bank robbery by force or violence in violation of 18 U.S.C. § 2113(a) and (d); (2) use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A); and (3) unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Because of the COVID-19 pandemic, the district court granted Walsh's motion to proceed with his sentencing hearing over videoconference after making the required CARES Act findings. At the sentencing hearing, the district court announced an intended total sentence of 156 months' imprisonment, the top of the adjusted Sentencing Guidelines range. In explaining this sentence, the judge asked rhetorically, "Why

the top end of the adjusted Guidelines range?" to which Walsh interrupted, saying calmly:

> Because you're a filthy stinking pig, you mother-fucker, and I'd blow your fucking brains out. That was a fucking -- I not only would blow your fucking brains out, you pig, but I would kill your entire fucking family and torture and murder each and every fucking one of them, you filthy, mother-fucking lying pig mother-fucker, you.

Walsh's profanity laced rant continued from there, spanning several pages of the hearing transcript. Walsh threatened violence against the judge, his family, the probation officer, and the Assistant U.S. Attorney. Walsh also repeatedly demanded that his threats be captured in the transcript and stated that he wanted to "start the appeal."

After Walsh's tirade, the district court concluded the hearing without imposing a sentence. Walsh then filed a motion for recusal and moved to withdraw his guilty plea. A few weeks later, the district court held another hearing, at which it denied both motions. The judge found recusal inappropriate because there was a "significant possibility that Mr. Walsh's purpose in … articulating that threat was … to prompt a change of judges through recusal." The judge stated that it was simply "a fact" that Walsh had "shown himself to be a strategic actor" in his criminal conduct and in how he had conducted himself in the case and thus found that "the most plausible reason for a strategic actor like Mr. Walsh" to "articulate[] his threat in great detail" "would be to prompt recusal, in the hopes that a different judge would give him a better sentence."

The district court proceeded to hold two additional sentencing hearings and ultimately sentenced Walsh to 96 months' imprisonment on the bank robbery and unlawful possession convictions and life imprisonment on the § 924(c) conviction for use of a firearm during a crime of violence, concluding that Walsh had shown himself "in both word and deed to be an incorrigibly violent offender and a capable and strategic one at that." In considering the 18 U.S.C. § 3553(a) factors, the district court emphasized the seriousness of Walsh's criminal conduct in this case, his extensive criminal history and contempt for the law, the serious threat of recidivism, and the danger he posed to the public. Walsh has appealed, arguing that the life sentence is substantively unreasonable and that recusal was required.

II

We review the substantive reasonableness of a sentence under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). We "will not reverse unless the district court's sentence falls outside the broad range of objectively reasonable sentences in the circumstances." *United States v. Daoud*, 980 F.3d 581, 591 (7th Cir. 2020) (citation omitted). Because "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a)" in each particular case, the fact that we may reasonably think a different sentence more appropriate "is insufficient to justify reversal." *Gall*, 552 U.S. at 51 (citation omitted).

In reviewing a sentence, we "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* "[T]here is no precise formula for deciding whether the basis for exceeding the range is proportional to the sentence's deviation from the range." *United*

*States v. Bridgewater*, 950 F.3d 928, 935 (7th Cir. 2020). But a district court "must give serious consideration to the extent of any departure from the Guidelines and … explain his conclusion that an unusually lenient or unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46. At the same time, we do not apply a presumption of unreasonableness to sentences outside the Guidelines range, and we "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* at 51. Moreover, "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (citation omitted).

## A

Walsh first contends that his sentence is substantively unreasonable because it departs from sentences given to similarly situated defendants. In fashioning a sentence, a district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). But not all disparities are "unwarranted," *United States v. Warner*, 792 F.3d 847, 862 (7th Cir. 2015), so there's "plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). And when a defendant is unique, sentence comparisons can prove less helpful. See *Warner*, 792 F.3d at 863 (finding "neither side's comparisons … very helpful" because the defendant was "unique"). Indeed, "every case [i]s a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).

Walsh correctly points out that his Guidelines range was far lower than other life-sentenced federal defendants and that a life sentence on a § 924(c) conviction is a statistical outlier. But Walsh is also an outlier, as is this entire scenario. Indeed, the parties have not pointed us to—and we cannot independently find—a case with even roughly comparable facts.

To start, Walsh received no criminal history points for very serious crimes. For example, he received no criminal history points on a murder conviction for shooting a police officer five times in the chest. He also did not receive points for two burglary convictions, a marijuana-dealing conviction, and a conviction for the unlawful use of several loaded weapons (including a submachine gun). See U.S. Sent'g Guidelines Manual § 4A1.2(e)(1) (U.S. Sent'g Comm'n 2018) (time limit for counting prior convictions). Although the district court departed upward on Walsh's criminal history category (raising it from III to IV) based on these unaccounted-for convictions, see U.S.S.G. § 4A1.3, the district court still rightly found this departure to "be very, very conservative … given the actual criminal history" and thus could reasonably find that the Guidelines still did not capture the full range of Walsh's past violent conduct, see *United States v. Gill*, 824 F.3d 653, 666 (7th Cir. 2016) (affirming the district court's variance from the Guidelines because "the actual [G]uidelines range did not capture the full range of [the defendant's] conduct and participation in violent activity").

Moreover, unlike nearly all criminal defendants, Walsh re-affirmed his commitment to lifelong criminality and violence directly to the sentencing judge. Walsh told the judge, "I don't have no respect for no law, rules, and regulations any fucking way, and I never have, and I never fucking will. I am what I am, and I ain't worried about shit, you mother-fucker, you." He threatened to torture and kill the judge, his family, the Assistant U.S. Attorney, and the probation officer, by cutting their throats "with no fucking hesitation." The judge thus reasonably concluded that Walsh, if given the opportunity, would continue to "commit violent crimes … until he draws his last breath" because that is exactly what Walsh said he would do. Walsh's open contempt for the law and threats of violence present an exacerbating circumstance, which the district court was entitled to consider. See *Bridgewater*, 950 F.3d at 939 ("[S]entences must account for exacerbating circumstances when the Guidelines do not.").

Just as Walsh's criminal history, antipathy for the law, and threats of violence are unique, so too is the likely impact of a life sentence in his case. Walsh was 71 years old at the time of his arrest. Given the average remaining life expectancy of someone in his position, Walsh will, in all likelihood, serve far less time in prison on his life sentence than a younger defendant receiving the same sentence. Indeed, Walsh argued that the initial proposed sentence of 13 years felt like a de facto life sentence because he would not be released until his mid-80s. This situation therefore departs from the mine-run of federal firearm and robbery offenses, which involve offenders who are, on average, 33–34 years old at the time of their criminal

conduct.[1] In these more typical cases with younger offenders, a life sentence for a § 924(c) conviction would typically be much longer than the Guidelines range, increasing the likelihood that such a sentence would be substantively unreasonable.

The district court "properly homed in on the unique circumstances" of Walsh's case in imposing a sentence that varied from the Guidelines and from that of other defendants facing similar charges. See *Kimbrough*, 552 U.S. at 89–90. The disparity between Walsh's sentence and that of other § 924(c) defendants was thus not unwarranted.

B

Next, Walsh emphasizes the disparity between the initial proposed sentence of 156 months' imprisonment before his tirade (which would have allowed for his release in his mid-80s) and his ultimate life sentence (which will incarcerate him for the remainder of his natural life). Walsh contends that the judge erred by substantially increasing his sentence based solely on the disrespect shown in court. But that's not what the judge did.

First, Walsh overemphasizes the amount of the increase by focusing on the delta between 156 months and life imprisonment. Normally, that would be a substantial increase. Yet what is at issue here is the difference between release in his mid-80s versus natural life in prison. We in no way minimize

---

[1] See U.S. Sent'g Comm'n, Sourcebook of Federal Sentencing Statistics 50 tbl.7 (25th ed. 2020), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf (last visited Aug. 24, 2022).

the effect of the life sentence, but the increase in sentence must account for Walsh's age and the reality that the district court had already determined—before Walsh's tirade—that he should remain incarcerated into his 80s.

Second, the judge did not increase the sentence based only on Walsh's display of disrespect. In the judge's words, "[T]he trouble … is not that Mr. Walsh showed disrespect for a court proceeding or for a judge on October 6th. It's what his statements revealed about himself, about what he truly thinks, about who he truly is." During his rant, Walsh—consistent with his violent, criminal past—expressed complete disdain for the rule of law and threatened extreme violence against several people in open court. As a result, the district court was within its discretion to conclude that Walsh's tirade justified the increase in his sentence based on what it revealed about Walsh's character, his risk of recidivism, and the danger he posed to the public. Those are precisely the factors which § 3553(a) directs district courts to consider. See *Warner*, 792 F.3d at 858. The district court thus did not abuse its discretion in sentencing Walsh to life imprisonment.

## III

We review a district court's denial of a defendant's motion for recusal made under 28 U.S.C. § 455 de novo. *United States v. Barr*, 960 F.3d 906, 919–20 (7th Cir. 2020). However, we have never addressed the applicable standard of review for a district court's factual findings in this context. We conclude that a clear-error standard is appropriate. We employ this standard when reviewing district court factfinding for other statutes relating to judicial duties, and we see no reason to take a different tack here. See, e.g., *United States v. Trudeau*, 812 F.3d 578, 583 (7th Cir. 2016) (using clear-error standard to review

factual findings underlying Speedy Trial Act decisions); *United States v. Wessel*, 2 F.4th 1043, 1053–54 (7th Cir. 2021) (reviewing factual findings supporting competency determination under 18 U.S.C. § 4241 for clear error); 18 U.S.C. § 3742(e) (When reviewing criminal sentences, "[t]he court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous … ."); Fed. R. Civ. P. 52(a)(6) ("Findings of fact … must not be set aside unless clearly erroneous, … ."). Indeed, we stand alone as the only circuit to employ a de novo standard of review to § 455 recusal decisions; every other circuit reviews them for abuse of discretion. So applying the deferential clear-error standard to factual findings brings us closer to the approach used by our sister circuits in this context.

Under the recusal statute, "[a]ny … judge, … of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or when the judge has a disqualifying circumstance, including "a personal bias or prejudice concerning a party," *id.* § 455(b)(1). Walsh argues that the district court had an obligation to recuse under both provisions.

A

We start with the latter provision, which deals with actual bias. To establish a judge's actual bias requiring recusal under § 455(b)(1), a party must show, by "compelling evidence," that "a reasonable observer would conclude that the judge was biased." *Barr*, 960 F.3d at 920.

Walsh agrees that the district court proceeded in a calm, measured, and courteous manner in response to Walsh's

behavior. See R. 158 at 49 (Walsh stating that the judge was "a hell of a gentleman" but "a lying coward pig"); cf. *United States v. Cooley*, 1 F.3d 985, 996 (10th Cir. 1993) (finding that the record disclosed no actual bias because "it appear[ed] that the district judge was courteous to the defendants and sedulously protected their rights"). Walsh's only evidence even arguably supporting actual bias is the judge's imposition of a life sentence. But it's hardly enough, let alone compelling. See *Barr*, 960 F.3d at 920.

The Supreme Court has held that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of … proceedings … do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). As a result, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion" because they generally rely on in-court proceedings and "can only in the rarest circumstances evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved." *Id.*

Here, the district court's imposition of a life sentence occurred during judicial proceedings and was based on facts acquired during those proceedings. To constitute a valid basis for a recusal motion, then, the sentence must involve one of the "rare[] circumstances," in which the ruling itself "display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* Yet, as discussed above, the judge imposed a substantively reasonable sentence after a thoughtful and measured explanation of the rationale supporting that sentence. Therefore, no reasonable person could find that the imposition of the life sentence displays a deep-

seated antagonism that would make fair judgment impossible. With no additional evidence of actual bias, Walsh has not shown that § 455(b)(1) required recusal.

B

Even when there is insufficient evidence of actual bias, recusal may still be required by § 455(a), which aims "to avoid even the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (citation omitted). Section 455(a) requires a judge to ask whether "an objective, disinterested observer fully informed of the reasons for seeking recusal would entertain a significant doubt that justice would be done in the case." *Barr*, 960 F.3d at 919 (quoting *United States v. Simon*, 937 F.3d 820, 826 (7th Cir. 2019) (internal citation omitted)).

Walsh argues that a reasonable observer would entertain a significant doubt that justice would be done because of his threats to the district court. However, as all circuits to have considered the question have recognized, recusal is not automatically—or even ordinarily—required when a defendant threatens a judge. See, e.g., *Cooley*, 1 F.3d at 994 (listing "threats or other attempts to intimidate the judge" as one of several circumstances that "will not ordinarily satisfy the requirements for disqualification under § 455(a)"); *In re Basciano*, 542 F.3d 950, 956–57 (2d Cir. 2008) ("recusal is not ordinarily or routinely required" due to a defendant's plots or threats). Instead, several factors surrounding the threat are relevant in determining whether recusal is required, including: (1) the defendant's demeanor in making the threat and the context in which it was made; (2) the perceived purpose of the threat; (3) the defendant's capacity to carry out the threat; and (4) the court's response to the threat. See *United*

*States v. Cordova*, 806 F.3d 1085, 1093 (D.C. Cir. 2015); *In re Basciano*, 542 F.3d at 956–57; *United States v. Dehghani*, 550 F.3d 716, 722 (8th Cir. 2008); *United States v. Holland*, 519 F.3d 909, 914–15 (9th Cir. 2008); *United States v. Greenspan*, 26 F.3d 1001, 1006 (10th Cir. 1994). We give great weight to the second factor, which asks whether a defendant's threats were "taken with recusal, or some other tactic that might delay or derail a case against him, in mind," *In re Nettles*, 394 F.3d 1001, 1002 (7th Cir. 2005), because no objective, fully informed observer could reasonably question a judge's impartiality based only on that judge's denial of a litigant's efforts to manipulate the judicial system through threats of violence, see *Holland*, 519 F.3d at 910–11, 915 (noting that this "is, perhaps, the most important factor" and holding that defendant's threatening message on the judge's home telephone was "an attempt to manipulate the court system" and thus did not warrant recusal, even though the defendant had "the ability to carry out his threats"); *Greenspan*, 26 F.3d at 1006 ("[I]f a judge concludes that recusal is at least one of the defendant's objectives (whether or not the threat is taken seriously), then section 455 will not mandate recusal because the statute is not intended to be used as a forum shopping statute."); *In re Basciano*, 542 F.3d at 956–57 (noting that, even when a threat is serious, "[a] defendant cannot be permitted to use such a plot or threat as a judge-shopping device").

For the first factor (the defendant's demeanor in making the threat and the context in which it was made), the district court found that Walsh's threats were "genuine" and that he was "calm" and "not raving" when making them. On appeal, no one disputes these findings and thus this factor weighs in favor of recusal.

However, as to the second factor (the perceived purpose of the threat), the district court found that Walsh's threats were motivated, at least in part, by a desire "to prompt recusal, in the hopes that a different judge would give him a better sentence." Because the parties dispute this factual finding, we review it for clear error. See *United States v. Thurman*, 889 F.3d 356, 363–65 (7th Cir. 2018) (noting that the question of whether a defendant acted strategically in refusing to sign a form acknowledging his *Miranda* rights was a fact issue reviewed for clear error); *United States v. Balsiger*, 910 F.3d 942, 952 (7th Cir. 2018) (directing that an assessment of a defendant's credibility is a factual finding reviewed for clear error in determining whether the defendant waived his right to counsel); *Wood v. Allen*, 558 U.S. 290, 293 (2010) (framing the issue of whether an attorney's decision not to pursue potential mitigating evidence was strategically motivated as a "factual finding").

After reviewing the record, we see no clear error in the district court's finding that Walsh's tirade was strategic and motivated, at least in part, by a desire to delay or derail his sentencing. Walsh started his threats right after the judge stated the sentence he intended to impose and just before the sentencing hearing could be completed. Walsh then demanded that his threats be captured in the transcript so that he could "start the appeal." And Walsh has acted strategically in the past to fit his particular purpose. For example, during the proceedings below, Walsh disagreed with strategic decisions made by his two appointed attorneys and moved to represent himself, which was granted after a *Faretta* hearing. See *Faretta v. California*, 422 U.S. 806 (1975). Walsh's underlying criminal conduct was also strategic. He planned the bank robbery and attempted second bank robbery by preparing a

disguise and plotting his escape. Walsh's criminal history, too, shows strategic behavior and meticulous planning: he has several aliases and has used disguises in a past robbery.

Walsh argues that it's "simply illogical for a defendant to think that he would receive a more lenient sentence from another judge after threatening a colleague." We generally agree; but the test is not whether Walsh's strategy was sound. Walsh has regularly employed strategic—though profoundly misguided—maneuvers in this case and in the past. That Walsh's chosen route may have been illogical does not mean that it was not strategic. Furthermore, Walsh may have concluded that, at age 71, he could hardly do worse than a 13 year sentence in front of a different judge. The district court thus did not clearly err in finding that Walsh's threats were motivated, at least in part, by a desire to delay or derail his sentencing. This factor therefore heavily weighs against requiring recusal.

The third factor (the defendant's capacity to carry out the threat) also weighs against requiring recusal. In assessing this factor, we consider whether a defendant: (a) has taken concrete steps to carry out the threat; (b) has a history of violence or of previous success in carrying out violent threats; and (c) is a member of a gang or has any contacts or accomplices who could carry out the threat on his behalf. See *Holland*, 519 F.3d at 914–15.

There is no indication that Walsh took any concrete steps to carry out his threat or that he even had the ability to take such steps. Cf. *In re Nettles*, 394 F.3d at 1003 (defendant called a purported supplier of ammonium nitrate to bomb the federal courthouse); *Greenspan*, 26 F.3d at 1005–07 (multi-state conspiracy included several persons who had contributed

money to hire a hit man to kill the judge and his family). Walsh was incarcerated at the time he made the threats, and although he had a history of violence, it was clear that he would receive a sentence that would imprison him well into his eighties, curbing his ability to follow through on them. See *Dehghani*, 550 F.3d at 721–22 (framing a threat as "empty" when defendant was in custody at the time the threat was made). Furthermore, Walsh's criminal history shows that he largely acted alone and was not a member of a violent criminal organization, reducing the chances that someone else would or could carry out the threat on his behalf. Cf. *Cordova*, 806 F.3d at 1093 (noting that the defendant had the capacity to carry out his threat because "he was a respected member of a violent international criminal organization with a broad geographic reach"). This factor, too, weighs against requiring recusal.

Finally, as to the last factor (the district court's response to the threat), we see no valid evidence that would allow a reasonable observer to question the judge's impartiality based on his response to the threat. The district court imposed a substantively reasonable sentence after a thoughtful and measured explanation, so no reasonable person could find that the judge's decision to impose a life sentence alone displays the kind of deep-seated antagonism necessary to constitute a valid basis for recusal under *Liteky v. United States*. 510 U.S. at 554–55. Moreover, a reasonable observer undertaking even a cursory review of the record would notice the district court's thorough and evenhanded approach to Walsh's case. The judge held five lengthy hearings to carefully consider Walsh's sentence. See *In re Basciano*, 542 F.3d at 957 (finding no appearance of partiality in the judge's actions after a defendant's threat when the judge acted "meticulously" and carefully

explained his reasoning). And it's clear that the judge listened closely to Walsh's arguments at each hearing. See, e.g., R. 160 at 9 (telling Walsh that he was "the most important person at the hearing," so he would always have the opportunity to speak). It's also clear that the judge focused on ensuring that his actions were fair. See, e.g., R. 162 at 59 (noting that, after a two-hour sentencing hearing, he "need[ed] to reflect on what was said, rather than simply process[ing] it on the fly" "in fairness to Mr. Walsh, … to the government, … to the public, … and in the interests of justice"). Because no reasonable person could question the district court's impartiality based on its response to Walsh's threats, this factor weighs against requiring recusal.

At bottom, then, only one factor favors recusal: Walsh was genuine in making his violent threats. The other three factors heavily weigh against requiring recusal. Walsh was motivated, at least in part, by a desire to manipulate the judicial system, he had little capacity for carrying out the threats, and the district court took no actions in response to the threats that could call his impartiality into question. Since no objective, fully informed observer could reasonably question the judge's impartiality here, the judge did not err by declining to recuse himself under § 455(a).

Our dissenting colleague rightly observes that this case could have followed a different path; the district court could have referred Walsh to the U.S. Attorney's Office for further prosecution on charges of threatening a federal judge. While some judges would have charted that course—and it would have reflected a sound response to Walsh's threatening tirade—we cannot say the district judge was required to do so.

AFFIRMED

JACKSON-AKIWUMI, *Circuit Judge*, dissenting. When Congress amended the federal recusal statute to include § 455(a), it addressed an important issue—the *appearance* of impropriety. 28 U.S.C. § 455; *Liteky v. United States*, 510 U.S. 540, 548 (1994). By requiring a federal judge to recuse himself "in any proceeding in which his impartiality might reasonably be questioned," § 455(a) replaced the previous statute's subjective test, which relied on the opinion of the judge, with an objective one, viewed from the perspective of a well-informed reasonable observer. *See Liteky*, 510 U.S. at 543–49 (detailing statutory history of § 455(a)). The purpose of the provision is "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860–61 (1988). To affect that purpose, Congress made § 455(a) public-facing and mandated that justice not only be impartial, but also reasonably perceived to be impartial.

The majority opinion concludes that a judge who changes a previously announced five-year sentence to a life sentence—after being excoriated and threatened by the defendant—does not create the appearance of impartiality requiring the judge's recusal under § 455(a). I respectfully disagree. I weigh the four-factor test about evaluating threats to judges differently than my colleagues, and I conclude that given the unique facts of this case—which all agree are rare—a "well-informed, thoughtful observer would perceive a significant risk that the judge [resolved] the case on a basis other than its merits." *United States v. Swallers*, 897 F.3d 875, 877 (7th Cir. 2018). Therefore, the judge was required to recuse himself under § 455(a). Because the judge's refusal to recuse himself in this case risked harm to the litigants and the public's confidence in the integrity of the judicial process, I would vacate Walsh's

sentence and remand for resentencing before a different judge.

## I

David Walsh's conduct during his initial sentencing hearing was, without question, disturbing. He heard the judge announce a total 156-month sentence: 96 months served concurrently for bank robbery and unlawfully possessing a firearm as a felon, followed by 60 months (the mandatory minimum) for carrying a firearm during a crime of violence. Walsh, at the time 73 years old, considered this a *de facto* life sentence: "I don't give a f*** about a life sentence. That's what you just sentenced me to," he told the judge. R. 158 at 46.

Walsh erupted into a profanity-laced tirade during which he called the judge names and challenged the judge's ethics (suggesting the judge was a shill for the government); repeatedly threatened to torture and murder the judge and the judge's family; and hurled threats at the probation officer and prosecutor. Walsh's rant was, by his own admission, "unhinged"—not even his lawyer could stop him. The judge continued the sentencing hearing, and when later presented with the issue of the appearance of impartiality, denied a motion to recuse. Two sentencing hearings later, the judge left the 96-month portion of the previously announced sentence undisturbed but changed the 60-month portion to life in prison.

## II

Recusal decisions are procedural and should be addressed prior to any substantive argument. *See Fowler v. Butts*, 829 F.3d 788, 790 (7th Cir. 2016) ("[w]e do not address the substance of [defendant's argument] because a procedural problem [recusal under 28 U.S.C. § 455(a)] takes precedence"). In

our circuit, we review recusal decisions de novo. *United States v. Barr*, 960 F.3d 906, 919–20 (7th Cir. 2020). Under § 455(a), courts have an obligation to avoid "the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (citation omitted). This requires a court to consider whether a reasonable, well-informed observer might question the judge's impartiality or "entertain a significant doubt that justice would be done." *United States v. Perez*, 956 F.3d 970, 975 (7th Cir. 2020) (citation omitted).

When threats against a judge are the issue, our sister circuits have developed some helpful guidance. Not all threats against a judge will mandate a judge's recusal under § 455(a), nor should it. *See United States v. Holland*, 519 F.3d 909, 915 (9th Cir. 2008) ("If so, defendants could readily manipulate the system, threatening every jurist assigned on the 'wheel' until the defendant gets a judge he preferred"). The determination properly depends on the totality of the circumstances, *United States v. Greenspan*, 26 F.3d 1001, 1007 (10th Cir. 1994), which prompts courts to consider four factors: (1) the defendant's demeanor in making the threat and the context in which it was made; (2) the perceived purpose of the threat; (3) the defendant's capacity to carry out the threat; and (4) the court's response to the threat. *See United States v. Cordova*, 806 F.3d 1085, 1093 (D.C. Cir. 2015) (citation omitted). This is a balancing test, and no one factor is dispositive. And "[i]f the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal." *Nichols v. Alley*, 71 F.3d 347, 350–52 (10th Cir. 1995).

The majority opinion weighs these factors to conclude that the judge was not required to recuse himself, but I weigh these factors differently. All agree, including the district court

judge, that Walsh's threats were genuine. Therefore, the first factor, as the majority opinion also concludes, weighs in favor of recusal. I depart from the majority opinion, however, when it comes to the application of the second, third, and fourth factors.

The second factor, which looks at the perceived purpose of the threat, weighs in favor of recusal. Unlike my colleagues, I am unconvinced that Walsh threatened the judge, in part, to seek recusal. To accept this would require us to believe that Walsh, by threatening the judge *after* the judge announced a sentence, understood that the sentence was not final. But the record supports otherwise. To begin, Walsh erupted after the court announced a 156-month sentence which suggests that he reacted to the sentence imposed. *See* R.158 at 45–46; R. 162 at 14–16. Walsh understood the sentence as final, otherwise, he would have never requested a transcript to start his appeal. Most criminal defendants understand that procuring a transcript is key to appealing a sentence, so I do not see how the majority opinion translates Walsh's request for a transcript as support that he intended to force recusal as opposed to appeal a sentence he just heard. *See* ante at 15.

That Walsh thought his sentence was final is also demonstrated by Walsh's surprise that the sentencing was to be continued: "Let me get this right. This mother-f**ker is going to continue this sentencing shit? ... [after] [w]hat I admitted to this creepy punk mother-f**ker[?]," he exclaimed. R. 158 at 50–51. Nothing in the record indicates that Walsh guessed in advance that the judge would continue his sentencing hearing. It therefore comes as no surprise that Walsh would later file an unopposed motion to recuse after learning that his sentencing was continued. *Cf. In re Basciano*, 542 F.3d 950, 956–57

(2d Cir. 2008) ("[i]f … a judge was assigned to hear a criminal case involving a defendant who had previously threatened the judge, the judge might well be required to recuse himself"); *see also United States v. Swallers*, 897 F.3d 875, 877 (7th Cir. 2018) ("a judge should not preside over a criminal case in which he or she is the victim …").

Yet the majority opinion, in finding no clear error, does not explain how, had the judge not continued the sentencing hearing (which, again, was a surprise to Walsh), Walsh could have intended to force recusal. If the judge had completed the sentencing hearing and kept his intended sentence (opting instead to start contempt proceedings or another separate proceeding, options I address below), Walsh would have been able to, as he intended, proceed to an appeal. But the majority opinion suggests that Walsh somehow knew that by erupting after the judge announced a sentence, the judge would continue the sentencing hearing and Walsh would then be able to use his transcript to seek recusal.

If Walsh's tirade occurred before the sentencing hearing, or even at the initial sentencing hearing but before the judge announced the sentence, then perhaps a finding that Walsh sought to force recusal would be reasonable. *See, e.g.*, *In re Basciano*, 542 F.3d at 956–57 (defendant composed a hit list before trial for the purpose of obtaining a different judge); *Holland*, 519 F.3d at 910 (defendant left at least one threatening message on the judge's home telephone number prior to sentencing). But to suggest that Walsh knew his sentence was not final—even when the judge *himself* inquired whether he was bound by the sentence he initially announced—is simply not plausible in light of the broader context. *See* R. 117. In my view, the record supports that Walsh exploded purely out of

anger in hearing his sentence, demonstrating his inability to control himself even when it was in his best interest to do so. I, therefore, see clear error in the district court's finding that Walsh's tirade was strategic and motivated in part to derail his sentencing hearing. Accordingly, I find the second factor, which looks at the perceived purpose of the threat, weighs in favor of recusal.

The third factor—Walsh's capacity to carry out the threat—also weighs in favor of recusal. In assessing this factor, we look at whether Walsh (a) took concrete steps to carry out the threat; (b) has a history of violence or has previously been successful in carrying out other threats; and (c) is a member of a gang or has accomplices or contacts who could carry out the threat on his behalf. *Holland*, 519 F.3d at 914.

Although there is no evidence that Walsh took steps to carry out his threat, there is no doubt that Walsh, whose history of violence is clear, had that capacity. Walsh may have been incarcerated at the time he made his threats, but he promised to carry them out if he were ever to leave prison. As a 73-year-old man with a track record of committing crimes upon release, his ability to carry out his threats, or at least attempt to, if released in his eighties is not far-fetched. *See* ante at 16–17. Even the judge believed as much. R. 161 at 9–10 (the judge stating, "I think he was completely genuine about everything he said, and what he said was what was actually on his mind. And he said he wanted to kill me and my family, and I think in the moment, he meant it."). Only the judge's later imposition of a life sentence guaranteed that Walsh would never be able to follow through with his threats. This third factor, then, weighs in favor of recusal.

That leaves the final factor—the district court's response to the threat—which as I see it, demonstrates that a reasonable observer might reasonably question the judge's impartiality. Walsh directly and repeatedly threatened the judge. Because of Walsh's tirade, the judge continued Walsh's sentencing hearing, not once, but twice. At the subsequent hearings, everyone who was threatened (i.e., the probation officer and prosecutor) absented themselves and sent in a replacement—except the judge. Despite finding that Walsh's threats were genuine and he was very capable of carrying them out, the judge declined to recuse himself. The judge then inquired whether the court was bound by its previously announced sentence. The government argued that the court was not bound by the initial sentence and recommended that the court impose a 175-month sentence instead of the previously announced 156-month sentence to account for Walsh's threatening statements. The government's suggested 175-months was based on a two-level increase under the U.S.S.G. § 3C1.1 for obstruction or impeding the administration of justice, which resulted in a sentencing range of 92 to 115 months, plus 60-months for the crime of carrying a firearm during a crime of violence, bringing the guideline range to 152 to 175 months. R. 162 at 38. Instead, the judge sentenced Walsh to life, which all agree created a statistical outlier for a conviction of carrying a firearm during a crime of violence, a crime with a mandatory minimum of 60 months in prison.

Based on the totality of the circumstances, a "well-informed, thoughtful observer would perceive a significant risk that the judge [resolved] the case on a basis other than its merits." *Swallers*, 897 F.3d at 877; *see also Greenspan*, 26 F.3d at 1006 (recusal required where judge indirectly learned of defendant's threat, accelerated the date of defendant's

sentencing, stated he wanted defendant to be locked up as soon as possible, and refused to grant a continuance for new counsel). In this case, a well-informed reasonable observer might question whether the judge changed Walsh's sentence to life because he was motivated, at least in part, to protect himself and his family from Walsh's threats since the previously announced 156-month sentence left open a possibility that Walsh would one day get out of prison. *See, e.g., In re Nettles*, 394 F.3d 1001 (7th Cir. 2005) (concluding that a reasonable observer would think that threatened judges would want defendant convicted and given a long sentence rather than have the opportunity to carry out the threat).

This is not to suggest that the judge did in fact resolve Walsh's sentence on a basis other than the merits or was actually biased or prejudiced. Only that a reasonable well-informed observer might *reasonably* think so. And that is all that matters. *See Liteky v. United States*, 510 U.S. 540, 548 (1994) ("what matters [under § 455(a)] is not the reality of bias or prejudice but its appearance"); *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) (10th Cir. 1993) ("the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue"); *Greenspan*, 26 F.3d at 1007 (10th Cir. 1994) ("[e]ven if this judge were one of those remarkable individuals who could ignore the personal implications of such a threat, the public reasonably could doubt his ability to do so"); *In re Nettles*, 394 F.3d at 1003 ("[w]e do not suggest that [the judge] would in fact be prejudiced against [the defendant]. The issue is appearances."). While my colleagues may be impressed with the judge's demeanor and "thorough and evenhanded approach to Walsh's case" after being repeatedly assaulted verbally, *see* ante at 17–18, "[w]e must bear in mind that [] 'outside observers are less inclined to

credit judges' impartiality and mental discipline than the judiciary itself will be.'" *In re Nettles*, 394 F.3d at 1002 (citation omitted).

Thus, from my perspective, all factors weigh in favor of recusal here. Even if the majority opinion is correct about the second factor when it concludes that the judge did not clearly err in finding that Walsh's tirade was in part meant to force recusal, the remaining factors still show recusal was required. The second factor is important, but not dispositive; if it were dispositive, it would insulate any decision by a district court not to recuse itself so long as it found that one purpose of a threat was to force recusal. Instead, the four-factor test is a balancing test. And if it is a close call, the balance tips in favor of recusal. *See Holland*, 519 F.3d at 912.

I find the four-factor test capable on its own of settling the question in favor of recusal here, but I also must note: while the test may be helpful guidance in some cases, it should not overwhelm the larger, more important question of whether there is an appearance of impropriety that must be avoided. Beyond Walsh's direct threats to the judge, his prolonged diatribe was profanity-laced, full of name-calling, and questioned the judge's ethics. And Walsh didn't just threaten the judge, but the judge's family and other public servants—the probation officer and the prosecutor—meaning his actions affected individuals inside and outside the courtroom. The current case law on threats to judges does not take these additional factors into account. I therefore wholeheartedly agree with my colleagues that this case is an aberration. As such, the unique circumstances in this case represent one of those rare circumstances where a judge should recuse himself, even

where the judge, rightly or wrongly, finds that a purpose of the threat was to force recusal.

## III

Although the judge should have recused himself, not every violation of § 455(a) requires reversal. *United States v. Orr*, 969 F.3d 732, 738–39 (7th Cir. 2020). "Mere appearance of impropriety is not enough for reversal and remand—a party must show a risk of harm." *Id.* (citations omitted). To determine whether the judge's § 455(a) violation was harmless, we consider three factors: (1) "the risk of injustice to the parties in the particular case"; (2) "the risk that the denial of relief will produce injustice in other cases"; and (3) "the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. In this case, the judge's violation of § 455(a) shows a risk of harm.

The first factor, which focuses on the fairness to the litigants in the case, favors remand for resentencing before a different judge. The judge in this case changed Walsh's sentence based solely on Walsh's "supplemental allocution." *See* R. 163 at 5–6, 24. As our court has previously noted, "[t]he open-endedness of the § 3553(a) factors leaves ample room for the court's discretion" which "invites the risk that a judge's personal biases will influence or appear to influence the sentence he imposes." *United States v. Atwood*, 941 F.3d 883, 885 (7th Cir. 2019). Upholding the sentence creates a real risk of unfairness to Walsh, no matter how reviled a defendant he may be at this point. By contrast, there is little risk to the government if the case is remanded for resentencing before a different judge. *See id.*

The second factor, which considers the risk of injustice to other litigants in future cases, also favors resentencing before a different judge. It is important to enforce § 455(a) in this case because it would encourage judges to consider the appearance of bias before significantly increasing a defendant's sentence, even to the point of imposing a life sentence, based solely on a defendant's supplemental allocution, no matter how disturbing.[1] This in turn would "prevent [an] injustice in some future case." *Atwood*, 941 F.3d at 885. Under the majority opinion, the next defendant to have an outburst in court may have his sentence changed to life by the same judge, regardless of how this appears to the public.

Finally, as to the last factor, there is a significant risk of harm to the public's confidence in the judiciary's impartiality. As we have declared, "[i]n sentencing, the most significant restriction on a judge's ample discretion is the judge's own sense of equity and good judgment." *Atwood*, 941 F.3d at 886. "When those qualities appear to be compromised, the public

---

[1] I pause briefly to address another point—the majority opinion's suggestion that Walsh's age of 73 at the time of sentencing somehow makes his life sentence reasonable. *See* ante at 8–9. Specifically, the majority opinion reasons: "Given the average remaining life expectancy of someone in his position, Walsh will, in all likelihood, serve far less time in prison on his life sentence than a younger defendant receiving the same sentence." *Id.* But the point here is not about how much time Walsh will likely serve on his sentence, it is about whether, from a reasonable observer's viewpoint, there is any risk of an appearance of bias in the judge's sentencing when Walsh went from the possibility of release to the certainty of dying in prison. This question, as I see it, is the same whether Walsh is 73 years old or 37 years old. But I see no need to engage further in the substantive unreasonableness of Walsh's sentence because again, the main issue is the appearance of bias, which is a procedural question we must address before considering substantive reasonableness.

has little reason to trust the integrity of the resulting sentence." *Id.* In this case, allowing Walsh's life sentence to stand could "undermine the public's confidence in the fairness of the sentence and the impartiality of the judiciary" because it creates the impression that the judge based his sentence on something other than the merits. *Id.* Thus, the judge's failure to recuse himself from Walsh's sentencing was not harmless.

**IV**

It is worth noting the well-placed, serious concern for the security of the nation's judiciary. *See Holland*, 519 F.3d at 912 ("[w]e are, unfortunately, reminded from time to time that threats against the judiciary have been carried out").[2] It therefore goes without saying that threats against judges are grave, and appropriate measures should be taken to address a defendant's verbal assault on members of the judiciary.

Such measures include contempt proceedings. *See* 18 U.S.C. § 401; *United States v. Gerezano-Rosales*, 692 F.3d 393, 404 (5th Cir. 2012) ("[c]ourts cannot ignore the rules governing contempt-of-court proceedings by treating the in-court misconduct as a § 3553 sentencing factor warranting an upward sentence variance without undermining the fairness and due process protections that surround and restrain the judicial power to punish for contempt of court"). Or, in more serious matters, additional criminal charges for the defendant. *See*

---

[2] *See also* BARRY J. MCMILLION, CONG. RSCH. SERV., IN11954, SECURITY OF THE FEDERAL JUDICIARY: BACKGROUND AND RECENT CONGRESSIONAL LEGISLATION (2022) ("according to the U.S. Marshals Service (USMS), there were 4,511 threats and inappropriate communication against federal judges, other federal court employees, and jurors during FY 2021. This represented a 387% increase over threats and inappropriate communications that occurred during 2015 (when there were 926 such incidents).").

*Greenspan*, 26 F.3d at 1007 ("any such ploy would likely result in further ancillary prosecution against a defendant in a way that may significantly multiply his or her problems with the law"). Both avenues were available in Walsh's case, and both would have likely involved a different judge presiding. *See, e.g.*, Fed. R. Crim. P. 42(a)(3) ("[i]f the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents"). In this case, a separate proceeding, whether for contempt or additional charges, would have done more to protect the public's confidence in the integrity of the judicial process.

## V

In addressing the procedural issue of recusal first, I would not reach the question of whether Walsh's sentence was substantively unreasonable. To summarize on the issue of recusal, I conclude, contrary to the majority opinion, that an objective, well-informed observer could reasonably question the judge's impartiality in this case, and therefore the judge violated § 455(a) by failing to recuse himself and his failure to do so is not harmless. The issue in this case is appearances. Public confidence in the judiciary is fragile and difficult to protect. To protect this confidence, I would vacate Walsh's sentence and remand for resentencing before a different judge. I respectfully dissent.